IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHOISIMENE MORILUS, et al., | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| v. | : | NO. 07-900 |
| | : | |
| COUNTRYWIDE HOME LOANS, | : | |
| INC., et al., | : | |
| Defendants | : | |

**M E M O R A N D U M**

STENGEL, J.                                                                    December 22, 2008

This lawsuit involves allegations of unfair practices in the procurement of a residential mortgage. The plaintiffs—Choisimene Morilus, Christopher Celian, and Filonise Celian—have brought multiple federal and state claims alleging that the defendants[1] engaged in negligent and/or deceptive mortgage lending practices.

Defendant Countrywide has moved for summary judgment on all counts and for its counterclaims for fraud and civil conspiracy. Upon consideration of the parties' memoranda and other filings, I will grant the motion as to all counts against Countrywide and its fraud counterclaim, and deny the motion as to the civil conspiracy counterclaim.

## I. Background facts

On January 28, 2005, plaintiff Choisimene Morilus executed a home mortgage for

---

[1] When the claim was initially filed, the defendants were Countrywide Home Loans, Inc. (Countrywide); Sunset Mortgage Co., L.P. (Sunset); Avonwood Capital Corp.; Pierucci, Inc.; Residential Appraisal Services, Inc. (Residential); Anthony Alkhal; and James Porter, Jr. Residential and Alkhal are no longer defendants.

$212,000 for a $238,000 property located in Whitehall, Pennsylvania (the Property).  (See Am. Compl. ¶ 10 (Document #43).)  Ms. Morilus does not read or speak English.  (Pls.' Opp'n Mem. at 8 (Document #83).)  Plaintiffs Christopher and Filonise Celian are husband and wife and reside at the Property; they were not signatories to the agreement. (Id.)  The Celians had initially tried to secure their own mortgage but their poor credit prevented them from getting favorable terms.  (Id.)  Their broker, Mr. Alkhal, asked if someone else could sign the application for them.  (Id.)  On Mr. Alkhal's suggestion, the Celians asked Ms. Morilus to sign on their behalf.  The Celians would not be leasing the Property nor would they be receiving it as a gift; instead, they would live there as if it were their own and make the mortgage payments.  (Id.)  Mr. Alkhal and Sunset were aware of this arrangement.  (Id.)

To facilitate the loan, Mr. Alkhal, in conjunction with the other defendants, allegedly misrepresented Ms. Morilus' assets.  (Id. at 9.)  The appraisal price of the Property was inflated, which forced the Celians to enter into a second mortgage with the sellers to cover the shortfall.  (Id.)  On the day of the closing, Mr. Alkhal met with Ms. Morilus and Mr. Celian.  Mr. Celian translated for Ms. Morilus.  The plaintiffs contend that Mr. Alkhal made only a cursory explanation of the documents' contents.  (Pls.' Resp. to Def.'s Statement of Material Facts ¶ 29.)

After the closing, many of the payments were late; Countrywide did not foreclose. (Id. ¶ 42.)  Finally, due in part to the financial hardships the Celians were facing, Ms.

Morilus sold the Property in April 2006 for $250,000.  The plaintiffs initially filed suit in the Court of Common Pleas of Philadelphia County, Pennsylvania, on January 29, 2007. The case was removed to federal court on March 5, 2007.  An amended complaint as to Countrywide was filed on September 21, 2007.  The complaint included eleven counts: (I) Negligence; (II) Truth in Lending Act (TILA); (III) Home Ownership and Equity Protection Act (HOEPA); (IV) Real Estate Settlement Procedures Act (RESPA); (V) Equal Credit Opportunity Act (ECOA); (VI) Fraud; (VII) Breach of contract; (VIII) Pennsylvania Fair Credit Extension Uniformity Act (Pa. FCEUA); (IX) Pennsylvania Unfair Trade Practices and Consumer Protection Law (Pa. UTPCPL); (X) Pennsylvania Credit Services Act (Pa. CSA); and (XI) Punitive damages.  It states that the "[d]efendants[2] conspired to unfairly and deceptively induce [them] to execute loan documents . . . premised upon a falsely inflated appraisal price" to qualify them for a loan with monthly payments they could not afford.  (Am. Compl. ¶ 17.)

On May 9, 2008, Countrywide filed the pending Motion for Summary Judgment. (Def.'s Mem. for Summ. J. (Document #75).)  The plaintiffs responded on June 23, 2008. (Pls.' Opp'n Mem. (Document #83).)  The response withdrew Counts III (HOEPA), V (ECOA), VIII (Pa. FCEUA), and X (Pa. CSA).

---

[2] As in many other places in their complaint and brief, the plaintiffs use the nonspecific term "defendants" even though they were responding to Countrywide's motion.  To the extent possible, I have construed the plaintiffs' brief as making each assertion against Countrywide itself.

## II.  Standard of review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  An issue is "genuine" when a reasonable jury could return a verdict for the non-moving party based on the evidence in the record.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" when it could affect the outcome of the case under the governing law.  Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case."  Celotex, 477 U.S. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

proof at trial." <u>Celotex</u>, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must view the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Anderson</u>, 477 U.S. at 255.  The court must decide not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  <u>Id.</u> at 252.  If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's version of events against the opponent, even if the quantity of the moving party's evidence far outweighs that of its opponent.  <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.  Discussion

### A.  The Celians' Standing

A preliminary issue is whether the Celians have standing.  This is a close question, but I find that they do.  Standing is a fundamental justiciability principle determining "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975).  It combines constitutional and prudential limitations on the exercise of judicial power.  <u>Id.</u>  The "irreducible constitutional minimum of standing" has three elements:

First, the plaintiff must have suffered an "injury in fact" - an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citations omitted). In addition to the constitutional limitations, the Supreme Court has recognized several prudential limitations, separate and distinct from Article III's requirements. These prudential standing requirements are "judicially self-imposed limits on the exercise of federal jurisdiction." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004). The Court has described the prudential standing requirements as "[(1)] the general prohibition on a litigant's raising another person's legal rights, [(2)] the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and [(3)] the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Id.

Countrywide's argument is three-fold. First, the Celians have suffered no cognizable injury. (See Def.'s Mem. for Summ. J. at 7.) They simply made payments to live in the home, which Countrywide would have the court recharacterize as a benefit. Countrywide also points out that the plaintiffs produced no evidence showing that Countrywide had "demanded payments from them, threatened to foreclose upon [the]

mortgage . . . or indicated in any way that it would issue negative credit reports identifying them." (See id. at 9.)   Second, even assuming that the Celians did suffer an injury, it was not causally connected to Countrywide's conduct and cannot be redressed by any finding that Countrywide breached its obligations to Ms. Morilus.  (Id.)  Third, Countrywide argues that Celians are attempting to raise Ms. Morilus' rights.  The legal interests created with the mortgage would belong to the signing parties: Ms. Morilus and Countrywide.  Because the Celians never signed any documents with Countrywide, they cannot bring suit for alleged violations relating to the mortgage.

In opposition, the Celians first contend they suffered concrete monetary damages. These would be the mortgage payments made to Countrywide, all the debt incurred in borrowing funds in conjunction with the mortgage, and their present inability to purchase a new home at their current location.  (See Pls.' Opp'n Mem. at 11–12.)  Second, they argue that the Celians only lack standing because the defendants intentionally kept them off of the mortgage and title documents.  (Id. at 12.)  Such actions, if true, could be a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL).  If so, the refusal to place the Celians' name on the property papers would be a concrete injury.[3]  Third, the Celians argue that the defendants conspired to effectuate the loan and violated various state and federal laws in doing so; Countrywide, as a co-

---

[3] The plaintiffs' argument assumes that Countrywide either took an active role in keeping the Celians' signatures off of the documents or that it shares liability for another defendant's actions.  For the purposes of this section only, I assume that Countrywide bears some direct or vicarious liability.

conspirator, would bear equal responsibility for the other parties' actions.  (Id.)

Assuming that the facts as stated in the complaint are true and drawing reasonable

factual inferences in the non-movant's favor, I will deny the motion as to this part.[4]

Countrywide's arguments, though persuasive, are in part premised on the fact that the

Celians never signed the agreement.  The plaintiffs, however, allege that the defendants'

active attempts to keep them off of the documents is the very reason they lack the

standing Countrywide demands.

While this by itself may not be sufficient to find standing, the plaintiffs astutely

indicate that such actions violate the UTPCPL.  That statute contains a "catch-all"

provision that prohibits all "fraudulent or fraudulent or deceptive conduct which creates a

likelihood of confusion or misunderstanding." 73 PA. CONS. STAT. § 201-1-2(4)(xxi)

(West 2008).  The Third Circuit has interpreted the UTPCPL as requiring that a plaintiff

bringing a private cause of action "show that he justifiably relied on the defendant's

wrongful conduct or representation and that he suffered harm as a result of that reliance."

Tran v. Metro. Life Ins. Co., 408 F.3d 130, 140 (3d Cir. 2005) (quoting Yocca v.

Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004)).  Assuming the plaintiffs'

factual allegations are true, the defendants did keep the Celians off of the documents.

This would then form the injury causally related to the defendants' conduct, which could

---

[4] My decision is not based on the merits of the underlying causes of action and should not be construed as any validation of the plaintiffs' claims.

be redressed by this court.[5]


### B. Alkhal acting as an agent

Countrywide moves to dismiss any claims for which any liability is wholly dependent on Mr. Alkhal's or Sunset's actions. The issue is whether Mr. Alkhal and Sunset were acting as Countrywide's agents. I find that they were not and will grant the motion as to this part.

"The basic elements of agency are 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" Scott v. Purcell, 415 A.2d 56, 60 (Pa. 1980) (quoting RESTATEMENT (SECOND) OF AGENCY § 1 cmt. b (1958)). Pennsylvania law requires the party asserting an agency relationship to prove its existence "by a fair preponderance of the evidence." Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co., 602 A.2d 1348, 1351 (Pa. Super. Ct. 1992). While Pennsylvania law recognizes various theories of agency, express agency and apparent agency are most applicable. See id. at 1351–52. The plaintiff need not provide direct proof of authorization so long as "it can be inferred from the facts that at least an implied intention to create the relationship of principal and agent existed." B&L Asphalt Indus. v. Fusco,

---

[5] The foregoing analysis would not allow the Celians to have standing for each and every claim they have brought. Because their standing is rooted in statute, the Celians are limited in what claims they could bring. For the purposes of this memorandum, I will consider the Celians as having standing for each claim they have alleged. My decision to do so should not be construed as an implicit validation of universal standing in this case.

2000 PA Super. 148, ¶ 11 (Pa. Super. Ct. 2000) (quoting Commonwealth v. Maker, 716 A.2d 619, 623 (Pa. Super. Ct. 1998)).  Although the question of agency is normally best suited for a fact-finder, it may be resolved on a motion for summary judgment if the facts are not in dispute.

### 1) Express agency

First, Countrywide argues that there was no exclusive agency relationship.  It points out that the plaintiffs have produced no evidence showing that Countrywide ever manifested an intent that Sunset or Mr. Alkhal were to act as its agent or that there was ever any understanding between the parties that an agency relationship was to be formed.  Indeed, Countrywide, Sunset, and Mr. Alkhal tried to make it clear to all of Sunset's clients that there was no agency relationship.  (See Def.'s Mem. for Summ. J. at 11, 13–14 (describing the various loan application documents, which Ms. Morilus had signed, that indicated the applications were to Sunset specifically).)

Countrywide cites Hawthorne v. American Mortgage, Inc., 489 F. Supp. 2d 480 (E.D. Pa. 2007), in support.  In that case, the Hawthornes sued both American Mortgage and Countrywide.  American Mortgage was the mortgage broker, and Countrywide was the lender American Mortgage worked with to finance the Hawthornes' mortgage.  Id. at 482.  The Hawthornes accused Countrywide of violating federal lending laws based on American Mortgage's conduct.  Id.  Their claims were premised on the argument that American Mortgage and Countrywide were in an agency relationship, which would make

Countrywide liable for the American Mortgage's actions.  Id. at 484.  The Hawthornes'

agency argument was based on four facts: 1) American Mortgage used Countrywide's

internal proprietary software, eApprove; 2) Countrywide let American Mortgage serve as

the primary contact person for the borrowers; 3) American Mortgage was a correspondent

bank that could serve as the lender itself and then place the loans with Countrywide; and

4) on occasion, Countrywide referred to American Mortgage as a "partner."  Id.  After

considering this evidence, the court determined there was no agency and granted

Countrywide's motion for summary judgment.  Id. at 484–85.

The plaintiffs focus on the control element and argue that Countrywide exercised

sufficient control to infer the existence of an agency relationship.  They point to three

specific facts: 1) the company's establishment and use of standard procedures that brokers

and brokerages must follow in order to do business with it; 2) its continued monitoring of

the brokers' work; and 3) its decision to terminate Mr. Alkhal for failing to follow

procedures.[6]  (See Pls.' Opp'n Mem. at 13.)  The plaintiffs distinguish Hawthorne on the

grounds that it was decided "just [on] the [broker's] use of Countrywide's software"; their

case adds the element of Countrywide's control. (Id. at 14.)

---

[6] Their argument is largely based on deposition testimony, which can be categorized in two ways.  The first set of statements concerns the requirements Countrywide placed on new brokers seeking to do business with it.  (See Thomas J. Longo, Jr. Dep. 23:17–24:23, Feb. 6, 2008.)  The testimony indicates before a broker was made a customer, information and credit checks were performed and his site was inspected.  (Id.)

The second set of statements was about the types of actions Countrywide regularly undertook during the course of the broker-lender relationship.  Namely, Countrywide required customer-brokers to "make registrations of mortgage applications that are affordable to the borrowers," expected brokers to abide by certain policies and procedures, and monitored their work on an ongoing basis.  (See id. at 31:4–32:12, 45:5-8.)

Even after drawing all reasonable inferences in favor of the plaintiffs, I do not find that an express agency existed.  While control is a key factor in determining whether an agency was intended, it must be of such a high degree that the purported agent is deemed to have had almost no independence.  See Mahon v. City of Bethlehem, 888 F. Supp. 310, 312 (E.D. Pa. 1995) ("[A]n agency relationship is distinguished from an independent contractor relationship based on the amount of control one party has over the other." (quoting Jones v. Century Oil, U.S.A., 957 F.2d 84, 86 (3d Cir. 1992)); cf. Colantonio v. Hilton Intern. Co., 2004 WL 1274387, at *6 (E.D. Pa. June 8, 2004) ("The requisite inquiry is whether some nexus exists between the parent corporation and the subsidiary . . . to indicate that the latter is not independent, but rather *totally* under the control and dominion of the parent." (quoting Ames v. Whitman's Chocolates, 1991 WL 281798, at *7 (E.D. Pa. Dec. 30, 1991))).

Considered separately or as a whole, the plaintiffs' evidence fails to raise a genuine issue as to whether Countrywide exercised such control.  For example, the plaintiffs have not distinguished Countrywide's initial application requirements for working with a new broker from any other similar application process.  Common sense and experience dictate that before two parties enter into a long-term business relationship, each side will perform due diligence.  Such a review is not easily characterized as "control."  The plaintiffs have presented no facts from which I could reasonably infer otherwise.

The testimony regarding Countrywide's continuing activities also falls short. The plaintiffs have only shown that if a broker wished to do business with Countrywide, he would have to adhere to certain guidelines and that Countrywide would work to ensure that those requirements were being met. Simply put, Countrywide was dictating the base requirements for any business transactions. Assuming that Mr. Alkhal and Sunset were fully compliant, the fact that they may have adhered to those standards does not necessarily indicate that Countrywide "controlled" them. No facts show how Sunset's internal practices may have differed from Countrywide's. No evidence has been provided about what kinds of guidelines Countrywide imposed. The plaintiffs would have the court infer that those standards were sufficiently tailored to constitute control, but have not supported their argument with sufficient evidence.[7]

As the plaintiffs have failed to show the existence of a genuine issue of material , I do not find that Countrywide created an exclusive agency.

### 2) Apparent Agency

I find that no apparent agency existed. Apparent agency is created when "[the principal] leads persons with whom his agent deals to believe he has granted" certain authority that actually exceeds the scope of the agency. See Hawthorne, 489 F. Supp. 2d at 486 (quoting Revere Press, Inc. v. Blumberg, 246 A.2d 407, 410 (Pa. 1968)). This empowers the agent to bind the principal even when such authority has not been actually

---

[7] Furthermore, as will be discussed below, Sunset and Mr. Alkhal were not beholden to working only with or for Countrywide. They were free to consult any number of lenders.

granted.  See 489 F. Supp. 2d at 486.

Countrywide points out that the plaintiffs have produced no evidence showing that Countrywide made any indication that would have led them to believe that Sunset or Mr. Alkhal were authorized to bind it to this mortgage.[8]  (See Def.'s Mem. for Summ. J. at 10–11.)  The true state of affairs was that Mr. Alkhal and Sunset had *no* power to bind Countrywide.  Any loan application had to be submitted to the company's underwriting department for independent approval.  (Id. at 13.)  Drawing again upon the signed documents indicating that Sunset was an independent contractor, Countrywide further argues that the court should adopt Hawthorne's reasoning, which rejected the argument that an apparent agency existed between a lender and broker.  The Hawthorne court was persuaded by the fact that the broker was free to submit the borrower's loan application to any number of lenders.  (Id. at 12–14.)

The plaintiffs argue that even if Sunset and Mr. Alkhal are independent contractors, the apparent agency theory is still applicable.  They contend that Countrywide ratified Mr. Alkhal and Sunset's actions by closing the loan and accepting mortgage payments.  (See Pls.' Opp'n Mem. at 13–14.)  Even if the underlying actions were initially unauthorized, the ratification would bind Countrywide.  (See id. at 13.)  The plaintiffs further argue that they "subjectively believed" Mr. Alkhal was Countrywide's agent because he was their sole contact prior to the closing and he controlled the terms.

---

[8] More fundamentally, Countrywide also argues that they made no communication to the plaintiffs that Sunset or Mr. Alkhal were even acting as its *agent.* (Def.'s Mem. for Summ. J. at 11.)

(Id. at 14.)

The argument glosses over a key prerequisite to establishing an apparent agency: evidence of some action by Countrywide indicating that Sunset or Mr. Alkhal was its agent. The closest the plaintiffs come to making such a showing is their statement that Mr. Alkhal was their sole contact with Countrywide and that he controlled the terms of the loan. (Id.) This falls far short. Mr. Alkhal was operating as an independent broker, no facts tend to show he controlled the loan's terms, and Countrywide's actions did not constitute a ratification of Mr. Alkhal and Sunset's actions.

First, the plaintiffs have not refuted Countrywide's assertion that Mr. Alkhal was an independent broker. Mr. Alkhal has testified that Sunset could serve as the lender itself or send the deal to any of over a hundred lenders. (See Anthony Alkhal Dep. 7:8–25, Oct. 4, 2007.) The choice of who the lender would be depended on the unique circumstances of each customer, and Mr. Alkhal was not obligated or beholden to any one company. He was free to submit Ms. Morilus' loan application to any third-party lender he thought would provide the best terms. Properly understood, Mr. Alkhal was an intermediary between borrowers and lenders. The plaintiffs have presented no evidence to the contrary.

Second, the plaintiffs have not supported their contention that Mr. Alkhal controlled the terms of the loan. Ms. Morilus signed several application documents clearly indicating that Sunset (and Mr. Alkhal by extension) was the lender and could

work with any number of third parties for financing.[9]  Although Sunset and Mr. Alkhal

guided the plaintiffs through the application process, they still had to submit the

paperwork to Countrywide for evaluation.  Only after Countrywide approved the deal was

it final.[10]  Because Countrywide's approval finalized the loan, the plaintiffs' claim that

Mr. Alkhal controlled the terms cannot stand.  Mr. Alkhal's preparation and submission

of the loan application was only an intermediate step; the ultimate decision was

Countrywide's.  The plaintiffs have pointed to no contrary evidence on this issue, and

deposition testimony highlights their understanding of this process.  (See Christopher

Celian Dep. 274:16–18, Jan. 10, 2008 ("[The loan application] would have to be

submitted to Countrywide in order for them to approve this mortgage.").)

Finally, an agency relationship was not created by ratification.  Ratification

---

[9] Countrywide's brief provides a succinct overview of the pertinent documents:
- The Mortgage Loan Origination Agreement stated that "[Sunset has] entered into separate independent contractor agreements with various lenders."

- The Mortgage Servicing Transfer Disclosure indicated that Morilus' application was to Sunset: "Thank you for applying for a residential loan with Sunset Mortgage Company (known as the Lender)."

- The Good Faith Estimate provided that "The word Lender refers to 'Sunset Mortgage Company.'"

(Def.'s Mem. for Summ. J. at 13–14.)

[10] Mr. Longo's testimony confirms the same:

Q.:   [Mr. Weisberg] My understanding of a mortgage broker such as Tony Alkhal, A-L-K-H-A-L, is that the mortgage broker essentially tries to find the best rate for the potential borrower while making a profit for himself by submitting the borrower's loan to an eligible lender.  Am I correct?

A.:   [Mr. Longo] Correct.  It's a retail origination.  He originated the loan.  He finds the best product and price for that particular customer.  And then he – he has opportunities to submit to any wholesaler he would like, and he picked Countrywide for this one.

(Longo Dep. 20:2–12.)

cleanses the agent's overstepping, but it does not necessarily *create* a general agency relationship by itself.  See Hawthorne, 489 F. Supp. 2d at 487 n.5 (noting the lack of evidence showing an "affirmative act" by the principal, consistent with an agency relationship).  As discussed above, there was no agency relationship between Countrywide, Sunset, and Mr. Alkhal, and the plaintiffs have presented no facts to suggest otherwise.[11]

All the cases the plaintiffs cite in support of their ratification argument presuppose an agency relationship or recognize that there may be sufficient evidence to infer its existence.  See Jones v. Century Oil U.S.A., Inc., 957 F.2d 84, 86–89 (3d Cir. 1992) (vacating the lower court's grant of summary judgment upon determining there was sufficient evidence as to the amount of control the defendant exercised over the plaintiff's use and operation of property to submit the agency issue to a jury); Gicking v. Hoch, 2006 WL 3742749, at *3 (E.D. Pa. 2006) (employer-employee relationship); Sheppard v. Aerospatiale, Aeritalia, 165 F.R.D. 449, 452 (E.D. Pa. 1996) (attorney-client); Davis v. Hoffman, 972 F. Supp. 308, 312–13 (E.D. Pa. 1963) (stating in *dicta* that a hospital may be liable for the torts committed by its independently contracted doctors when (1) a patient coming for treatment looks primarily to the institution for care, and (2) the hospital holds the physician out as one of its employees).

As the plaintiffs have failed to demonstrate a genuine issue of material fact as to

---

[11] Similarly, the fact that Countrywide accepted the Celians' payments hardly serves as any evidence of an agency relationship.

whether an agency relationship existed, all claims against Countrywide requiring a finding that Mr. Alkhal or Sunset acted as its agent are dismissed.  For the purposes of this memorandum, however, I have retained and considered all the remaining claims.

### C. TILA

The plaintiffs allege that Countrywide violated their TILA obligations by failing to provide all statutorily mandated disclosures.  (Am. Compl. ¶¶ 26–27.)  The TILA requires creditors to disclose credit terms "accurately and meaningfully" to potential debtors prior to the extension of credit.  See 15 U.S.C.A. § 1601(a) (West 2008).  By enacting the TILA, Congress sought "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."  Id.  When a creditor violates a TILA obligation, the consumer may seek to rescind the transaction or recover actual and statutory damages.  Id. §§ 1635(a), 1640(a).  The complaint seeks both TILA remedies.

The TILA tolerates some disclosure discrepancy.  For closed-end credit transactions secured by real property, "[t]he general rule is that a finance charge disclosure . . . is accurate if the amount disclosed does not understate the actual finance charge by more than $100 or if the amount disclosed exceeds the actual finance charge."  Ralph J. Rohner & Fred H. Miller, Truth in Lending 167 (2000); see also 15 U.S.C. § 1605(f)(1).  If the consumer seeks rescission, the disclosure is accurate if it "does not vary from the actual finance charge by more than an amount equal to one-half of one

percent of [the note's face value]." 15 U.S.C. § 1605(f)(2)(A).  The plaintiffs have

compared the Truth in Lending Disclosure Statement (Pls.' Opp'n Mem. Ex. D) and the

Settlement Statement (Pls.' Opp'n Mem. Ex. A) and have identified $1101.00 of

contested charges.[12]  (See Pls.' Opp'n Mem. Ex. C.)  The rescission tolerance for this

loan is $1062.00.

### 1) Remedy of rescission

I find that the plaintiffs' request for rescission is barred by the statute of

limitations.  The debtor's "right of rescission . . . expire[s] three years after the date of the

consummation of the transaction or upon the sale of the property, whichever occurs first .

. . ." 15 U.S.C. § 1635(f).  In interpreting the effect of the three-year limitation, the

Supreme Court has held that the federal right to rescind expires at the end of that period.

Beach v. Ocwen Fed. Bank, 523 U.S. 410, 418 (1998).  The Court noted that the statutory

language "limits more than the time for bringing a suit, by governing the life of the

underlying right as well."  Id. at 417.  Consequently, when three years have passed, the

---

[12] The plaintiffs group the contested charges into two categories: Undisclosed pre-paid finance charges, and up-charges.
The undisclosed pre-paid finance charges are as follows:

| | | |
|---|---|---|
| 1) | $300.00 | Appraisal |
| 2) | $395.00 | Closing fee |
| 3) | $65.00 | Tax certification |
| 4) | $50.00 | Document preparation |
| 5) | $35.00 | Closing service letter LTIC |
| 6) | $10.00 | Wire fee |
| 7) | $35.00 | FedEx fee |
| 8) | $116.00 | Recording fee |

(See Pls.' Opp'n Mem. Ex. C.)  An up-charge for $95.00 is identified as the "[d]ifference in title insurance in listed sales price minus $20,000.00 'Sellers' Assist' or second mortgage that Plaintiffs never actually received and actual sales price."  (Id.)

debtor can no longer seek rescission.  The natural extension of this interpretation requires that a similar bar be triggered upon the occurrence of the second condition: the sale of the property.  See 15 U.S.C. § 1635(f).  Ms. Morilus sold the property in April of 2006.  (Am. Compl. ¶ 20.)  Her right to rescind expired at that point, and she may no longer seek that remedy.

### 2) Monetary damages

I will grant Countrywide's motion as to this part because the statute of limitations has run.  Section 1640(e) provides a one-year limitations period running "from the date of the occurrence of the violation."  15 U.S.C. § 1640(e).  Unlike the limitations period for rescission, this period is subject to equitable tolling.  See Ramadan v. Chase Manhattan Corp., 156 F.3d 499, 505 (3d Cir. 1998) (remanding for further consideration as to whether the TILA statute of limitations should be tolled when the plaintiff alleged that the car dealership-defendant had misrepresented the cost of the car's warranty and had retained a portion of the funds).  The court reasoned that allowing violating lenders to evade liability by concealing their wrongful acts would undermine the statute.  Id. at 502. The Third Circuit has recognized at least three situations where equitable tolling may be appropriate: "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum."  Kemezis v. Matthew, 2008 U.S. Dist.

-20-

LEXIS 47330, at *11 (D.N.J. 2008) (citing Oshiver v. Levin, Fishbein Sedran & Berman,

38 F.3d 1380, 1387 (3d Cir. 1994)).  The party seeking equitable tolling must demonstrate

that he has been reasonably diligent in pursuing his claims.  Kemezis, 2008 U.S. Dist.

LEXIS 47330, at *11.

     Here, the plaintiffs have not demonstrated that equitable tolling is appropriate.[13]

First, they have not shown that Countrywide actively misled them regarding their cause of

action.  They correctly state that the law provides for equitable tolling where a fraud has

been perpetrated, and they make blanket allegations that Countrywide and other

defendants had engaged in such activities.  (See Pls.' Opp'n Mem. at 18–19.)  No facts,

however, are raised to support any reasonable inference that Countrywide acted to

conceal the finance charges in question.[14]

     The plaintiffs were not prevented from asserting their rights.  At no time did

Countrywide conceal any of the challenged finance charges.  On the contrary, the

plaintiffs were provided copies of both the Truth in Lending Disclosure Statement (Pls.'

---

[13] Because the plaintiffs have not argued that they had mistakenly raised these claims in the wrong forum, that theory is not considered.

[14] The plaintiffs' reliance on Wise v. Mortgage Lenders Network USA, Inc., 420 F. Supp. 2d 389 (E.D. Pa. 2006), is misplaced.  The facts of that case are readily distinguishable from those here, which makes its reasoning inapplicable.  In that case, the plaintiffs alleged that they had been coerced into accepting a loan whose terms differed from those they had sought.  Id. at 392.  The plaintiffs had balked at signing the loans.  To placate the plaintiffs' concerns, the lenders made repeated promises to refinance and distribute some amount of cash in a few years' time.  Id. at 391.  When the plaintiffs sought the promised refinancing and cash disbursement two years later, they were rebuffed.  Id. at 392.  The court rejected the defendants' statute of limitations defense.  The plaintiffs would have had no reason to suspect that the defendants had acted deceptively until they refused to honor their promise.  Id. at 395.
     The facts at bar show no similar attempt by Countrywide to engage in fraud or otherwise deceptive conduct.  The plaintiffs have had full access to all the relevant documents and could deduce which charges had not been properly disclosed, if any.

Opp'n Mem. Ex. D) and the Settlement Statement (Pls.' Opp'n Mem. Ex. A).  These

documents were given to (and signed by) Ms. Morilus on or before the closing date.  (See

Longo Dep. 102:8–13 (stating that all required disclosures had been mailed to Ms.

Morilus at least two weeks before the scheduling closing); Choisimene Morilus Dep.

94:15–95:6, Jan. 11, 2008 (stating that Ms. Morilus had signed all of the closing

documents and that she agreed to everything).)  The identified disclosure discrepancies

can be found on the face of these documents.  A line-by-line comparison of the charges

shows what was or was not disclosed.  Because the plaintiffs have failed to demonstrate

that equitable tolling is appropriate, I will dismiss these claims.

### D. RESPA

I will grant Countrywide's motion as to the plaintiffs' RESPA claims.  The

RESPA is designed to ensure that consumers are made aware of settlement procedures

and costs by imposing certain disclosure requirements, and to eliminate kickbacks and

referral fees that increase the cost of the settlement process.  12 U.S.C. § 2601(b).  The

Act applies to federally related mortgage loans issued by federally insured lenders or

creditors (as defined in TILA) that make residential real estate loans.  12 U.S.C. § 2602

(1)(B)(iv).

The plaintiffs first contend that Countrywide failed to respond to Ms. Morilus'

"Qualified Written Requests"[15] regarding the mortgage.  (Am. Compl. ¶¶ 37–38.)  Upon

receipt of a request, the servicer must make the appropriate corrections, provide a written

explanation stating why the servicer believes the borrower's account to be correct as

stated, or provide an explanation as to why the requested information is unavailable or

unobtainable.  12 U.S.C. § 2605(e)(2).  If no request is submitted, the servicer's duty to

reply is not triggered.  See Jeffries v. Ameriquest Mortgage Co., 543 F. Supp. 2d 368,

384–85 (E.D. Pa. 2008) (dismissing RESPA claim after the plaintiff admitted she had sent

no written requests or complaints to the servicer).  This argument is easily dismissed.

First, the plaintiffs have not contested this point in their memorandum.  (See Pls.' Opp'n

Mem. at 16–17.)  Second, the plaintiffs never made any written requests to Countrywide.

Ms. Morilus herself testified that she never made any contact with Countrywide.[16]

Countrywide had no duty to reply to the Celians because they were not the borrowers.

The plaintiffs next allege that Countrywide engaged in kickbacks by failing to

---

[15] A "Qualified Written Request" is "a written correspondence . . . that . . . (ii) includes a statement of the
reasons for the belief of the borrower . . . that the account is in error or provides sufficient detail to the servicer
regarding other information sought by the borrower."  12 U.S.C. § 2605(e)(1)(B) (2008).

[16] Ms. Morilus has testified to this effect:

| Q.: | [Mr. Weinstein] Did you ever send any letters to Countrywide after the closing, asking Countrywide to explain any part of the loan? |
| A.: | [Ms. Morilus]   No. |
| Q.: | Did you ever call Countrywide after the closing to ask them to explain any part of the loan to you? |
| A.: | No. |
| Q.: | Did you ever send a letter to Countrywide to say to Countrywide, I don't owe you these payments? |
| A.: | No. |
| Q.: | Did you ever send a letter to Countrywide saying that there was some part of these papers that you signed that was not accurate? |
| A.: | I never write any letter. |

(Morilus Dep. 129:20–130:12.)

disclose the property appraisal charge on the mortgage documents.[17]  (Id. at 16.)  The

claim is untimely.  Section 2614 provides that an action for kickbacks must be brought

within one year from the date of the occurrence of the violation.  See 12 U.S.C. § 2614.

Here, the date of the violation was the date of the closing: January 28, 2005.  Because the

suit was not filed until January 27, 2007, the claim is barred by the statute of limitations.

### E.  Negligence

I will grant Countrywide's motion as to the negligent misrepresentation claim.[18]

Under Pennsylvania law, a negligent misrepresentation claim requires proof of: "(1) a

misrepresentation of a material fact; (2) made under circumstances in which the

misrepresenter ought to have known of its falsity; (3) with an intent to induce another to

act on it; and; [sic] (4) which results in injury to a party acting in justifiable reliance on

the misrepresentation."  Bortz v. Noon, 729 A.2d 555, 561 (Pa. 1999).  A negligent

misrepresentation claim must be based on some duty owed by one party to another.  See

Gibbs v. Ernst, 647 A.2d 882, 890 (Pa. 1994).

The brief baldly argues that Countrywide should be liable for negligent

---

[17] 12 U.S.C. § 2607(b) provides: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."

[18] The amended complaint raised a general claim for negligence.  In addition to attacking the claim substantively, the defendants argue is that it is barred by the "gist of the action" doctrine. (Def.'s Mem. for Summ. J. at 15–17.)  In response, the plaintiffs clarified the scope of that claim to one for negligent misrepresentation. (See Pls.' Opp'n Mem. at 22–23.)  Under the economic loss doctrine, the negligent misrepresentation claim should proceed because the plaintiffs have allegedly suffered more than just economic loss. (Id. at 22.)  Without passing judgment on which doctrine—gist of the action, or economic loss—should apply, I will consider the plaintiffs' negligence count insofar as it states a negligent misrepresentation claim.

misrepresentation but provides no supporting facts of what misrepresentations Countrywide made.  Even when considering other sections of their brief, the plaintiffs have not established the existence of a genuine issue of material fact.  For example, the plaintiffs allege that the "[d]efendants misrepresented and falsified" Ms. Morilus' loan application and "used an inflated appraisal."  (See Pls.' Opp'n Mem. at 15 (stating facts raised to support the plaintiffs' Pa. UTPCPL claim).)  These are not factually supported. The loan application information came from Mr. Alkhal, not Countrywide.[19] Countrywide's underwriting department processed the loan based on the information it received from Mr. Alkhal and did not participate in filling out the loan documents; because Mr. Alkhal was not an agent, the plaintiffs cannot properly claim that Countrywide played a part in the alleged misrepresentation and falsification.

Similarly, the claim that Countrywide inflated the appraisal price is directly contradicted by the facts in the record.  The price was calculated by Residential and provided to Countrywide by Mr. Alkhal.[20]  Countrywide had no contact with Residential

---

[19]

| | | |
|---|---|---|
| Q.: | [Mr. Weinstein] Is it fair to say that [Mr. Alkhal] may not have – he many not be able to – while he may not be able to affect Countrywide's decision on making the loan, that all of the information that you have regarding this borrower that you're providing to your underwriting department comes from Mr. Alkhal? | |
| A.: | [Mr. Longo] Yes. | |
| Q.: | So, then, if Mr. Alkhal gives you information that's not accurate that's all you'd have to go on, correct? | |
| A.: | Correct. | |

(Longo Dep. 107:1–11.)

[20]

| | |
|---|---|
| Q.: | [Mr. Weisberg] Okay.  So, you were not personally involved in the appraisal of the real estate that [the Celians] came to inhabit? |
| A.: | [Ms. Mary Olney] I appraised the property for Morilus.  Actually, I appraised it for Sunset Mortgage. |

until this litigation,[21] and Mr. Celian's testimony confirms his understanding that the appraisal was conducted by other parties.[22]

Even assuming the alleged TILA or RESPA violations can be attributed to Countrywide, the plaintiffs have not established the element of materiality.  Black's defines "material" as "Of such a nature that knowledge of the item would affect a person's decision-making."  BLACK'S LAW DICTIONARY (8th ed. 2004).  The plaintiffs have forwarded no facts tending to establish the materiality of the finance charge underdisclosures or the failure to disclose the property appraisal charge.[23]  I am mindful

---

| Q.: | Okay. |
|-----|-------|
| A.: | I had no relationship with the buyer. |

*     *     *

| Q.: | But the person or the people that had contacted you was from Sunset Mortgage; is that right? |
|-----|-------|
| A.: | Correct. |

(Mary Olney Dep. 13:25–14:6, 14:11–14, Feb. 4, 2008.)

[21]

| Q.: | [Mr. Wishnoff] Outside of this litigation and the documents that you've looked at in this litigation, do you have any knowledge of who or what Residential Appraisal Services, Inc., is? |
|-----|-------|
| A.: | [Mr. Longo] No. |
| Q.: | Have you ever had any personal contact with Mary Olney? |
| A.: | No. |
| Q.: | Any contact with anyone at Residential Appraisal Services, Inc.? |
| A.: | Not that I remember, no. |

(Longo Dep. 90:19–91:5.)

[22]

| A.: | [Mr. Celian] So when I was going over the numbers with [the appraiser hired by the Celians for selling the Property], I asked him, what is the chance somebody could fabricate the appraisal?  He said it is a good chance.  He said who did the appraisal?  I said it was Tony—it was the broker and the real estate agent business associate.  He said that is a conflict of interest. |
|-----|-------|

(Christopher Celian Dep. 242:14-20.)

[23] I have made no finding as to whether the plaintiffs could establish the element of materiality.  I only conclude that they have failed to set forth a *prima facie* claim.

-26-

that the standard for summary judgment requires me to draw factual inferences in favor of the non-movant.  This standard provides no relief though when the non-movant fails to establish an element of the claim.  For the stated reasons, I will dismiss the negligence claim.

**F. Fraud**

The plaintiffs claim that the defendants deceived them by using an inflated appraisal price.  They also suggest that the defendants wrongfully took advantage of Ms. Morilus' inability to speak or read English and had her sign the loan application documents despite knowing that it was the Celians who intended to live there.  I will dismiss both claims.

An action for fraud under Pennsylvania law requires showing (1) a misrepresentation (2) of a material fact, (3) scienter, (4) intent to induce reliance, (5) justifiable reliance by the party alleging fraud, and (6) damages proximately resulting from the alleged fraud.  See Wittekamp v. Gulf & W., Inc., 991 F.2d 1137, 1142 (3d Cir. 1993).  The claims will be dismissed because the plaintiffs have not provided proof of any representations—let alone misrepresentations—Countrywide made to them before or during the loan application process.  Their deposition testimony only confirms the opposite.  (See Filonise Celian Dep. 67:22–68:5, Feb. 5, 2008 (stating that there was no communication between the Celians and Countrywide before the closing); Christopher Celian Dep. 219:7-9 (same); Morilus Dep. 129:6-10 (same).)

-27-

Moreover, none of the plaintiffs' claims can be properly attributed to Countrywide. The appraisal price was determined by Residential in partnership with Sunset and Mr. Alkhal.  The loan application information was allegedly falsified by Mr. Alkhal, who was not Countrywide's agent.  No facts indicate that Countrywide took advantage of Ms. Morilus' inability to speak and understand English.  Finally, Countrywide did not learn of the arrangement between Ms. Morilus and the Celians until after the transaction was completed.  (Def.'s Statement of Material Facts ¶ 49.)  Because Mr. Alkhal was not operating as Countrywide's agent and the plaintiffs have not raised any genuine issue of material fact, I will dismiss their fraud claim.

**G. Pa. UTPCPL**

The UTPCPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade of commerce . . . ."  73  PA. CONS. STAT. ANN. § 201-3.  Section 201-2(4) provides specific examples of unfair practices as well as a catch-all provision.  Id. § 201-2(4).  The plaintiffs raise three distinct claims under the UTPCPL.  The first claim is based on the statute's catch-all provision.[24] (See Am. Compl. ¶ 79(b).)  They allege that Countrywide acted in a deceptive or confusing way by "misrepresent[ing] and falsif[ying] loan information," "submitt[ing] a forged arbitration clause," "conceal[ing] finance charges," "exploit[ing] Plaintiffs by placing only a non-

---

[24] The UTPCPL's catch-all provision defines "unfair method of competition" and "unfair or deceptive acts or practices" to include "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 PA. CONS. STAT. ANN. § 201-2(xxi) (West 2008).

English speaking person on the mortgage and title," "fail[ing] to have a notary present during the closing," and "us[ing] an inflated appraisal." (Pls.' Opp'n Mem. at 15.) I need not address whether such acts were "deceptive" because the plaintiffs have not set forth all the elements of a UTPCPL claim.[25]

To bring a UTPCPL cause of action, "a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." Hunt v. United States Tobacco Co., 538 F.3d 217, 224 (3d Cir. 2008) (quoting Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004)). In Hunt, the Third Circuit rejected the argument that the addition of the word "deceptive" to the catch-all provision negated the need to prove justifiable reliance and concluded that it is a requirement. Hunt, 538 F.2d at 225. Under this standard, the plaintiffs' claim fails because Countrywide made no representation for them to rely on, whether justifiably or not. Indeed, Countrywide did not act to induce them to act to their detriment. All of the plaintiffs' interaction had been with Mr. Alkhal who was not a Countrywide agent. Consequently, there was nothing for the plaintiffs to justifiably rely on, and Countrywide cannot be held to have engaged in any "fraudulent or deceptive conduct" here.

The second claim is that the alleged TILA and RESPA violations are enforceable under the UTPCPL. (Am. Compl. ¶ 79(c).) The argument appears to be that since the

---

[25] The parties disagree as to whether the catch-all provision requires proving all the elements of common law fraud or whether demonstrating a course of deceptive conduct is sufficient. In a prior order, I dismissed one of the plaintiffs' UTPCPL claims against another defendant for failure to prove all the elements of common law fraud. I note that Pennsylvania courts have disagreed over the proper interpretation, but the issue need not be resolved here. I find that under either construction, the claim fails.

TILA and RESPA are consumer protection acts, violations of those laws are *per se* violations of the UTPCPL.  I will dismiss this claim.  I find the reasoning in <u>Christopher v. First Mutual Corp.</u>, 2008 U.S. Dist. LEXIS 32781 (E.D. Pa. Apr. 22, 2008), to be illuminating.  In <u>Christopher</u>, the plaintiff brought federal and state claims against his mortgage banker and a loan officer.  These included claims under the TILA, RESPA, and UTPCPL; in a prior order, the court dismissed the TILA and RESPA claims as time-barred.  <u>See</u> <u>Christopher v. First Mutual Corp.</u>, 2007 U.S. Dist. LEXIS 75530 (E.D. Pa. Oct. 9, 2007).  One of the plaintiff's claims was that the TILA and RESPA violations were actionable *per se* violations of the UTPCPL.  2008 U.S. Dist. LEXIS 32781, at *41. The court dismissed the claims on two grounds.  First, the plaintiff's legal authority did not support his argument that TILA or RESPA violations were *per se* UTPCPL violations.[26]  <u>Id.</u> at *43–44.  Second, allowing the plaintiff to pursue the claim under the UTPCPL would circumvent the TILA and RESPA's respective statutes of limitations.  <u>Id.</u> at *44.

Here, the plaintiffs are similarly situated.  They have presented *no* legal authority to support their position, and the statutes of limitations for the underlying TILA and RESPA claims have run.  Allowing the plaintiffs to pursue those same claims would undermine Congress' intent to provide finality.

---

[26] The court stated that while some consumer protection statutes specifically provide that a violation of the statute constitutes a UTPCPL violation, neither the TILA nor RESPA make such an allowance.  2008 U.S. Dist. LEXIS 32781, at *41–42.

The plaintiffs' final claim is that Countrywide misrepresented the "character, extent, or amount of the debt or its status in a legal proceeding," "that the loan would be beneficial when in fact it was not," and "the characteristics or benefits of the loan." (Am. Compl. ¶79(a), (d)–(e).)  My reasons for dismissing this claim remain the same as for all other claims based on alleged representations by Countrywide: the plaintiffs have not shown that Countrywide made any representations to them.  Their response provides no particularized allegations supporting the claim.  Without a representation, there was no misrepresentation.

**H. Breach of contract**

I will dismiss the claim for breach of contract.  Under Pennsylvania law, a properly pled breach of contract claim demonstrates "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." Corestates Bank, N.A. v. Cutillo, 1999 PA Super. 14, ¶ 16 (Pa. Super. Ct. 1999).  Each element must be specifically pleaded. Id.

I find that the plaintiffs have failed to prove that a contract existed.  Their brief states that "[Countrywide] promised Plaintiffs a loan to purchase the premises at a fair rate based on an accurate appraisal" but that the "[d]efendants conspired to falsely inflate the purchase price of the premises, to their benefit." (Pls.' Opp'n Mem. at 24.)  What the plaintiffs have failed to show is why any promise Countrywide may have made constitutes a contract.  They present no evidence of consideration they gave for such a

promise nor have they pointed to legal authority suggesting that such an alleged promise constitutes an enforceable contract.

A more fundamental problem is that the plaintiffs have not shown how or when Countrywide made such promises to them. Again, Mr. Alkhal was not their agent, and none of the plaintiffs had any communication with Countrywide until after the closing. Consequently, I will dismiss this claim.

### I. Punitive damages

I will dismiss Countrywide's punitive damages claim. Under Pennsylvania law, punitive damages are used to punish the defendant for his outrageous conduct and to deter him and others from engaging in similar misconduct. Calhoun v. Yamaha Motor Corp., U.S.A., 216 F.3d 338, 347–48 (3d Cir. 2000) (citing Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800, 803 (Pa. 1989)). The plaintiff must provide evidence sufficient to establish that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed, and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." Hutchison v. Luddy, 870 A.2d 766, 772 (Pa. 2005). The claim for punitive damages should be dismissed because the plaintiffs have not sufficiently demonstrated Countrywide's liability on any of the above claims. They have also failed to plead facts showing that Countrywide consciously disregarded any potential harm to the plaintiffs.

### J.  Countrywide's counterclaims

Countrywide has moved for summary judgment on its two counterclaims.  The first

claim is that Ms. Morilus committed fraud in filling out her mortgage application.  The

second claim is that Ms. Morilus and the Celians conspired to commit fraud against

Countrywide.  I will grant the motion as to the fraud claim and deny it as to the

conspiracy claim.[27]

#### 1)  Claim 1: Fraud

In Pennsylvania, the elements of a fraud claim are: "(1) a representation; (2) which

is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or

recklessness as to whether it is true or false; (4) with the intent of misleading another into

relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury

was proximately caused by the reliance."  Viguers v. Philip Morris USA, Inc., 2003 PA

Super. 446, ¶ 18 (Pa. Super. Ct. 2003).

Countrywide argues that Ms. Morilus had represented that she would be using the

Property as her primary residence. (Def.'s Mem. for Summ. J. at 36–37.)  Namely, the

Uniform Residential Loan Application, which Ms. Morilus signed, indicated that the

Property would be her primary residence.  (See Morilus Dep. Ex. D-15.)  Also, the

---

[27] As a preliminary matter, the court may still exercise supplemental jurisdiction even if it has dismissed "all claims over which it [had] original jurisdiction." 28 U.S.C.A. § 1367(c)(3). When deciding whether to retain jurisdiction, the court "should take into account generally accepted principles of 'judicial economy, convenience, and fairness to the litigants.'"  Growth Horizons, Inc. v. Delaware County, Pennsylvania, 983 F.2d 1277, 1284 (3d Cir. 1993) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)). As discovery has already been completed and the litigation has been pending for over 18 months, the interests of judicial economy weigh in favor of considering the counterclaims.

language of the mortgage contract stated that the subject property was to be used as the mortgagor's primary residence within 60 days of execution.  (See Morilus Dep. Ex. D-8.)

The representation was allegedly material to the transaction because the mortgage contract stated that Ms. Morilus would be in default if she had made material representations in her application.  The contract defined a "material misrepresentation" in part as including representations regarding the use of the mortgaged property as the primary residence.  (See Morilus Dep. Ex. D-8.)

As to the elements of falsity and scienter, Countrywide points to Ms. Morilus' responses to its request for admissions.  Ms. Morilus admitted that she had "purchased [the Property] . . . with the intent that Christopher Celian and Filonise Celian" would use it as their primary residence.  (See Def.'s First Req. for Admis.)  She also admitted that she did not change her primary residence after purchasing the Property.  Given that Ms. Morilus had not intended to use the Property as her own residence at the time of the transaction and never did used the Property as her residence, she knew her statements to be false and intended for Countrywide to act on the application's contents.

Countrywide argues that it justifiably relied on Ms. Morilus' representations for two reasons.  First, it was never made aware of Ms. Morilus' intentions.  (See Def.'s Mem. for Summ. J. at 38.)  This point is allegedly confirmed by the plaintiffs' deposition testimony.  (See Christopher Celian Dep. 287:22–288:2 (admitting that the plaintiffs knew of "[no] evidence that would suggest that Countrywide knew" of the application's

fabrications); Filonise Celian Dep. 143:4–9 (admitting that "as far as Countrywide was concerned," Ms. Morilus was the one living in the property and making the payments, and that the company would not have known who the Celians were).)

Second, Countrywide *actually* relied on Ms. Morilus' representations and charged a lower interest rate than it normally would have.  (See Def.'s Mem. for Summ. J. Ex. 12 (Joseph Stanganelli Aff.).)  Ms. Morilus was charged an interest rate of 6.875 percent; a factor in this calculation was her assertion (through the signed documents) that the Property would be her primary residence.  (Id. ¶ 13.)  Had Countrywide known Ms. Morilus was not going to occupy the Property, it would have charged 8.75 percent.  (Id.) The 1.875 percent interest rate increase is used to compensate for "the increased underwriting risk associated with financing the purchase of non-owner occupied investment properties."  (Id.)  All other things being equal, Countrywide estimates its loss in potential profits to exceed $4000.

The plaintiffs raise two counter-arguments.  First, they argue that the fraud claim is defective.  (See Pls.' Opp'n Mem. at 25.)  Countrywide suffered no loss because the loan was paid in accordance with its terms.  Second, the plaintiffs contend there is no evidence of fraud.  (Id.)  Sunset and Mr. Alkhal were fully aware of the plaintiffs' arrangements, and Countrywide cannot claim to have been misled by any of the plaintiffs' representations.

I find that Countrywide is entitled to summary judgment on its fraud claim.  When

signing the mortgage application documents, Ms. Morilus was representing to Countrywide that the Property would be her primary residence.  This representation was material to the transaction not only because the mortgage explicitly made such misrepresentations "material" but also because the mortgage's terms would have been different if Countrywide had been aware of Ms. Morilus' actual intentions.  Ms. Morilus herself has admitted that when she signed the mortgage for the Celians she had no intentions of changing her primary residence.  Countrywide was never made aware of the plaintiffs' plan, had approved the mortgage on the basis of the application's representations, and charged a lower interest rate.

Contrary to the plaintiffs' first assertion, Countrywide has suffered cognizable damages.  Relying on Ms. Morilus' representation that she would make the Property her primary residence, Countrywide charged a lower interest rate; had Ms. Morilus indicated otherwise, the higher rate would have been charged.  The difference between the rates that were and should have been charged represents an economic injury of lost profits that Countrywide was entitled to absent Ms. Morilus' misrepresentation.  As Ms. Morilus has presented no evidence contesting the Stanganelli Affidavit, I will accept its facts as true.

Ms. Morilus counters that Countrywide cannot make out a claim for fraud because she and the Celians had "advised Sunset and Alkhal that Ms. Morilus would purchase the premises for the Celians to live in and pay the mortgage."  (Pls.' Opp'n Mem. at 25.) This argument assumes, however, that Sunset or Mr. Alkhal operated as Countrywide's

agent or had informed Countrywide of the arrangement.  If Countrywide had such a

relationship with Sunset or Mr. Alkhal or had been informed by them, it would have no

fraud claim.  Countrywide's representative has indicated that the company had no prior

knowledge of the arrangement.[28]  No proof is shown that either Mr. Alkhal, Sunset, or the

plaintiffs passed on such information to Countrywide.  The fact of the matter is that the

plaintiffs have produced no evidence supporting either of their theories.  Because

Countrywide has stated a valid claim and there is no genuine issue as to a material fact, I

will grant its motion as to this claim.

### 2) Claim 2: Conspiracy to Commit Fraud

Countrywide also alleges that the plaintiffs conspired to commit fraud against

Countrywide.  I will deny and dismiss Countrywide's motion as to this part because

Countrywide has not made out the *prima facie* case.  To state a claim for civil conspiracy,

a party must show "(1) a combination of two or more persons acting with a common

purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful

---

28

| Q.: | [Mr. Weinstein] In this case, is there anything in the file to indicate that Miss Morilus was taking this loan and buying the house at Memphis Road to use as an investment property? |
| A.: | [Mr. Longo] No.  There is nothing in the file to that |
| Q.: | Is there anything in the loan file that reflects what purpose Miss Morilus was purchasing this home for? |
| A.: | Just as a primary residence to purchase a new home. |
| Q.: | Okay.  So, is it fair to say that Countrywide wrote this plan based on Miss Morilus' representation through Mr. Alkhal that this was goign to be her primary residence? |
| A.: | Yes. |
| Q.: | Does Countrywide have any reason to know that, in fact, Miss Morilus was buying this home for her relatives to live in? |
| A.: | No. |

(Longo Dep. 107:21–108:15.)

purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." Estate of Werner v. Werner, 2001 PA Super. 220, ¶ 8 (Pa. Super. Ct. 2001) (quoting McKeenan v. Corestates Bank, N.A., 2000 PA Super. 117, ¶ 14 (Pa. Super. Ct. 2000)).  Additionally, there must be proof of malice or an intent to injure. See Constitution Bank v. DiMarco, 836 F. Supp. 304, 308 (E.D. Pa. 1993) ("Proof of the intent to injure, however, is essential, and this intent must be absent justification." (quoting Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979))).  Bald assertions that certain actions were malicious are insufficient; it must be alleged that the "*sole* purpose of the conspiracy was to injure the Plaintiffs." American Indep. Ins. Co. v. Lederman, 2000 U.S. Dist. LEXIS 12351, at *65 (E.D. Pa. Aug. 28, 2000) (emphasis added) (quoting Spitzer v. Abdelhak, 1999 U.S. Dist. LEXIS 19110, at *30 (E.D. Pa. Dec. 15, 1999)).

Countrywide has failed to produce any evidence of the plaintiffs' malice.  Even though Countrywide has shown that Ms. Morilus' actions amounted to fraud, the commission of the act itself does not necessarily indicate that the plaintiffs acted with the specific intent to injure Countrywide.  The plaintiffs were guided by personal interests separate from any alleged desire to cause harm to Countrywide. Cf. Thompson, 412 A.2d at 472 (dismissing a claim for civil conspiracy where the facts indicated that one of the defendants had "acted solely to advance the legitimate business interests of his client and to advance his own interests").  Because the facts here largely show that the plaintiffs

acted solely to advance the Celians' interest in home ownership, Countrywide has not

established the *prima facie* case for civil conspiracy, and the claim should be dismissed.


**IV. Conclusion**

For the foregoing reasons, I will grant Countrywide's motion in part and dismiss it

in part.  The plaintiff's claims as against Countrywide will be dismissed.  Countrywide's

counterclaim for fraud will be granted.  Countrywide's counterclaim for civil conspiracy

will be dismissed.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHOISIMENE MORILUS, et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **NO. 07-900** |
| | : | |
| **COUNTRYWIDE HOME** | : | |
| **LOANS, INC., et al.,** | : | |
| **Defendants** | : | |

**O R D E R**

**STENGEL, J.**

     **AND NOW**, this 22d day of December, 2008, upon consideration of the defendant

Countrywide's Motion for Summary Judgment (Document #75), it is hereby ORDERED that the

motion is GRANTED IN PART and DENIED IN PART:

    1)    All counts against defendant Countrywide Home Loans, Inc. are DISMISSED. The Clerk shall terminate Countrywide Home Loans, Inc. as a party.

    2)    Countrywide Home Loans' counterclaim for fraud is GRANTED.  Countrywide Home Loans shall submit a more definitive statement of the damages it has suffered on this claim on or before January 5, 2009;

    3)    Countrywide Home Loans' counterclaim for civil conspiracy is DISMISSED.

                                   BY THE COURT:

                                   /s/ Lawrence F. Stengel
                                  LAWRENCE F. STENGEL, J.